[Civ. No. 3106.   Fourth Dist.   Mar. 23, 1944.]

ELIZABETH F. SCHMIDT, Appellant, v. PENSION BOARD FOR · THE ADMINISTRATION OF THE RELIEF AND PENSION FUND, etc. et al., Respondents.

Claflin, Dorsey & Campbell for Appellant.

R. Y. Burum, City Attorney (Bakersfield), and John Shortridge, Assistant City Attorney, for Respondents.

GRIFFIN, J.—Plaintiff and appellant Elizabeth F. Schmidt is the widow of Emil J. Schmidt who, at the time of his death was a member of the Bakersfield Fire Department and had been hired by that department for a period of approximately 20 years. The record shows that Mr. Schmidt, during that 20 years of active service as a fireman, served in many of the various capacities incident to being a member of a fire fighting unit. He died on June 7, 1940, of heart disease known as coronary occlusion. Thereafter, and in due time, petitioner filed with the board of trustees (pension board) for the administration of the relief and benefit fund for members of the fire department of that city, an application as the widow of said deceased for an annual pension in the sum of $1,200, to be paid in equal monthly installments and to continue during her lifetime or until her remarriage, as provided in section (169)5 of the Bakersfield City Charter, which section reads:

"Whenever any member shall die either, (a) as a result of any injury arising out of or sustained by him while in the discharge of his duties as a member of the Fire Department of the City of Bakersfield, or (b) From sickness caused by or resulting from the discharge of his duties as a member of such Department; there shall be paid an annual pension of Twelve Hundred Dollars, ($1200.00) in equal monthly installments on the regular paydays, to his survivor or survivors, as follows: (1) To the surviving widow of such member during her lifetime or until her remarriage. . . ."

Section (177)13 thereof provides for death benefits and the method for computing the amount payable to a wife when a member of the department dies because of risks other than those set forth in section (169)5. Under the charter provisions all pertinent matters pertaining to the administration of the pension fund were placed in the hands of the pension board. On June 30, 1942, a hearing was had before the pension board which found that "it was the unanimous opinion of the board that the death of Emil J. Schmidt was not the result of illness or injury incurred in the performance of duty. The board found the applicant to be entitled to disability and retirement benefits under section (177)13 . . ." and allowed such benefits. Petitioner then filed a petition for writ of mandate

to require defendants and respondents to grant a pension to petitioner and place her name upon the pension roll and pay her the annual pension of $1,200. The court granted an alternative writ.

An answer was filed by defendants. The action came on for hearing and the trial court found "that Emil J. Schmidt died on the 7th day of June, 1940; that his death took place in his home at a time when he was not upon active duty as a member of said fire department" and ". . . that by reason of the facts and by reason of the conflict of evidence at the hearing before said pension board, it appears that said board did not abuse its discretionary powers and did not act in violation of law . . . that . . . the petitioner became entitled to an award as provided by section (177)13 of the charter. . . ." It then rendered judgment that the alternative writ of mandate theretofore issued be discharged and denied the issuance of a peremptory writ. Petitioner then appealed. The evidence, all documentary, adduced at the trial, bearing on the question here presented, was as follows: (1) City charter; (2) transcript of proceedings and evidence taken before the pension board; (3) amended application for pension; (4) death certificate; (5) letter from Dr. Tuttle; (6) statement from a Dr. Moore, autopsy surgeon.

The only question here presented is whether or not the evidence which was considered by the pension board and trial court was conflicting, and whether or not it was sufficient to support a finding that Emil J. Schmidt did not die as a result of any injury arising out of or sustained by him while in the discharge of his duties as a member of the fire department of the city of Bakersfield or from any sickness caused by or resulting from the discharge of his duties as a member of such department.

The facts surrounding the illness and death of the deceased are set forth in the statement received in evidence in the form of a letter from Dr. Tuttle, the deceased's personal physician, which letter is directed to the state pension insurance fund. It reads as follows:

"Gentlemen:

"With regard to the circumstances surrounding the death

of Emil J. Schmidt I wish to advise that I saw this man on the morning of June 7, 1940, around 10 A. M. He came in for his regular treatment. He had his treatment consisting of massage of the prostate, diathermy to the shoulder and passive manipulation. He made no complaints of any kind to indicate he was not feeling well.

"About 8 P. M. of the same date, June 7th, 1940, I received a phone call from Mr. Schmidt's wife who indicated he was quite ill. I went to the man's home and found that he suddenly developed a severe pain under the lower part of the sternum and broke into severe perspiration. This had happened just a few moments before his wife called me.

"I found Mr. Schmidt in bed and the perspiring had stopped but recurred two or three times in the next forty five minutes. The pain continued in spite of hypodermic injections of 1/20th of a grain of Dilaudid. I also used a tissue extract—Pepronex during the care of the man. The condition was definitely suggestive of a coronary occlusion. At about 8:50 p. m. he sat up to belch and had a convulsion and stopped breathing.

"The history of the activity of the man during that day was that there was nothing noticed at all during the day of any illness. In fact Mr. Schmidt had helped his wife with the canning of some apricots during the day. He was home on that day as it was his day off work.

"On June 8, 1940, I did an autopsy with Dr. William Moore and Dr. Headen Inman present. We did not examine the body other than for the heart and found the valves of the heart in good condition but a complete occlusion of the anterior descending branch of the left coronary artery. There was a narrowing of the coronary vessel at this and one other location. A thrombosis of the vessel occurred completely blocking it.

"Past history was entirely negative and at no time during the course of his treatment was there anything to suggest any heart ailment.

"I see nothing to indicate that this man's death was brought about in any way by the injury to the shoulder or by his employment, except that his employment as a fireman could be a contributing factor in the development of sclerosis

of the coronary arteries. There is no way to determine the period of time this condition had been existent.

"There is no way for me to give a definite opinion that the condition or death was due to the employment.

"A. M. Tuttle, D. O."

The death certificate signed by Dr. Tuttle indicates that he attended the deceased (aged 50 years) from November 5, 1939, to June 7, 1940; that the immediate cause of death was "coronary occlusion; duration 1 HR." and the death was due to "sclerosis coronary vessels." The transcript of the proceedings and evidence taken before the pension board shows that Mrs. Schmidt testified that her husband injured his shoulder about a year prior to his death and that he had been taking treatments for that; that when her husband came home on his day off he made complaint about a pain in the left side of his chest in the region of his heart and that he said he had it on the day before when he was on duty; that her husband was an engineer in the fire department and had been acting as captain at various times and had fought many fires during his twenty years of service in the department; that he worked a shift of twenty-four hours on duty and twenty-four hours off duty; that he was subject to call at all times; that during their twenty-eight years of married life he had no serious sick spells; and that the shoulder injury happened during a night when he was on duty when an alarm came in. Counsel for petitioner then stated: "Now we don't claim this shoulder injury had anything to do with this heart attack. . . ." Petitioner then testified that her husband had his tonsils removed in December, 1939, because he was advised by his doctor that his bad tonsils might be contributing to the stiff shoulder of which he complained. Other witnesses testified as to the character and hazards of the deceased's particular duties in connection with his employment. Petitioner then presented as her witness a licensed physician and surgeon, who never attended the deceased, to whom was propounded a hypothetical question based upon the deceased's age, his duties as a fireman, the fact that he came home on the day in question in an exhausted condition and complained to his wife of severe pains, that the autopsy revealed that the deceased died of coronary occlusion and that the valves of the

heart were in good condition but showed a complete occlusion of the anterior descending branch of the left coronary artery; that there was a narrowing of the coronary vessel at this and one other location and that thrombosis of the vessel occurred completely blocking it off. In answer to this question the witness testified that the deceased's "occupation would be a contributing cause to the death" and that deceased's "sickness was caused by or resulted from the discharge of his duties as an employee of such department." On cross-examination the doctor testified that up to 1930 coronary occlusion had not been discovered, but since that time doctors have made investigation and that 40 per cent of the people whose deaths are from that cause are "foremen or executives . . . working at strenuous work . . . and strenuous life"; that he had never had a fireman affected with this since 1930; that a lot of doctors died of heart trouble; that one may have coronary occlusion without arterial sclerosis, but 90 per cent of the cases have arterial sclerosis first; that the cause of that is extreme exercise, over eating, and over drinking, starting a deposit in the arteries; over smoking, and other things that might cause excitement; that if the deceased had "stopped, taken care of himself . . . eating, sleeping, and drinking, he would have lived twenty years longer." At the hearing before the board petitioner offered in evidence the findings and award of the Industrial Accident Commission showing that the deceased "sustained injury arising out of and in the course of the employment within the meaning of and as provided by section 3213 of the Labor Code." This was received in evidence before the pension board over objection. Before the trial court, objection to its admissibility was sustained. After introducing into evidence the statement of Dr. Moore, attending autopsy surgeon, before the pension board, the board made its findings. His report was as follows:

"On Saturday, June 8, 1940, I attended an autopsy performed by Dr. Tuttle on the body of E. J. Schmidt. The chest only was examined. It was found that the heart revealed a thrombosis of a coronary artery. No other pathology about the heart or chest was found.

"I had never examined or treated Mr. Schmidt. I attended the autopsy at the request of Mrs. Schmidt, who is a patient of mine. Dr. Inman, pathologist, was also present at this autopsy."

From an examination of the evidence we must conclude, as the trial court did, that the evidence presented to the pension board did create a conflict on the issue involved and the board was fully justified in holding that the deceased did not die as a result of any injury arising out of or sustained by him while in the discharge of his duties. The deceased's physician, who was familiar with deceased's ailments for several years prior to his death, who treated him prior to and on the day of his death, and who conducted the post mortem examination was in a much better position to give an accurate opinion than was a physician who merely answered a hypothetical question bearing on the subject.

The attending physician gave as his opinion that he could "see nothing to indicate that this man's death was brought about in any way by the injury to the shoulder or by his employment, except that his employment as a fireman could be a contributing factor in the development of sclerosis of the coronary arteries. There is no way to determine the period of time this condition had been existent. There is no way for me to give a definite opinion that the condition or death was due to his employment. . . ." The effect of his opinion negatived the opinion related by the medical expert based upon a hypothetical question, and created such a conflict therewith as would authorize and support the finding made by the pension board. It does not necessarily follow, from the mere fact that there may be evidence that one's employment, in any field, might be a contributing factor in the development of sclerosis of the coronary arteries, that his death thereafter would be the result of illness or injury incurred in the performance of his employment. From the testimony of the so-called expert witness himself such condition may have been the result of "over eating," "over drinking," "over smoking," "excitement," and absorption of toxines in the system. The chief of the department and three other members of the pension board had been members of the fire department for many years. They knew how active the deceased's duties were and heard testimony on the subject. The charter provision provided that the ". . . said board shall have charge of the disbursements from such fund" and such further duties "as are necessary to carry out the purposes intended" by it.

An appellate court has no power to set aside findings

of a judicial body vested with fact finding power when such findings are based on conflicting substantial evidence. (*Thoreau* v. *Industrial Acc. Com.*, 120 Cal.App. 67 [7 P.2d 767] ; *Arais* v. *Kalensnikoff*, 10 Cal.2d 428 [74 P.2d 1043, 115 A.L.R. 163].) ▮ The determination of the Industrial Accident Commission was not res judicata, was not binding on the pension board, and did not prevent a contrary determination by it. (*Drummond* v. *Drummond*, 39 Cal.App.2d 418 [103 P.2d 217].) If this claim of the appellant was meritorious it would result in the Industrial Accident Commission having the power to deal with and dispense funds in the care and management of the pension board of the Fire Department of the City of Bakersfield. It would in reality do away with the duties and powers of that board. We see no connection between the two proceedings.

In view of this determination it becomes unnecessary to decide other questions raised by petitioner. The denial of the peremptory writ was proper.

Order affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied April 18, 1944, and appellant's petition for a hearing by the Supreme Court was denied May 18, 1944.